THE PEOPLE *ex rel.* Scott Bibb

*v.*

THE MAYOR AND COMMON COUNCIL OF ALTON.

*Opinion filed June 20, 1899.*

1. EVIDENCE—*mandamus to compel admission of colored children to public school—latitude of proof.* Upon a trial of the issues under a petition for *mandamus* to compel city authorities to admit the relator's children to a public school, from which it is alleged they were excluded on account of their color, in pursuance of a general design by the respondents to separate white and colored children, the People are not confined to proof of the motive for excluding the children of the relator alone, but may show that all colored children were likewise excluded from "white schools."

2. SAME—*same—effect where there is no record of authority for action of officials.* Where city authorities have made no public record of the authority for their action in carrying out their design to keep colored children out of "white schools," the existence of such illegal motive may be established by other competent evidence.

3. SAME—*when declarations are part of res gestæ.* Where the mayor of a city is one of the respondents to a petition for *mandamus* to compel the city authorities to admit the relator's children to a public school, from which it is alleged they are excluded by the board of education on the ground of their color alone, the answer given by him to a citizens' committee, explaining his reason for excluding such children, is part of the *res gestæ* and admissible on hearing of the issues of fact under the petition.

4. SCHOOLS—*children cannot be excluded from public school on account of color.* No child otherwise entitled to attend a certain public school can be excluded therefrom, directly or indirectly, by school officers or public authorities on account of his being colored.

5. SAME—*when mandamus lies to compel city authorities to admit colored children to school.* Where a board of education, created by a municipal corporation, unlawfully excludes colored children from a public school, with the consent and approval of the city authorities and under a well understood plan to separate white and colored children in the public schools, *mandamus* will lie against the city authorities to compel the admission of such children.

ORIGINAL petition for *mandamus.*

An original petition was filed in this court by the People, on the relation of Scott Bibb, for a writ of *mandamus* against the mayor and members of the common

council (naming them) of the city of Alton, to compel them to admit the children of the relator, viz., Minnie Bibb and Ambrose Bibb, to the Washington school, or the most convenient of the public schools of said city to which they have the right to be admitted, without excluding them, or either of them, on account of their color or descent. The petition is substantially as follows:

"Your petitioner, the People of the State of Illinois, on the relation of Scott Bibb, who is a citizen of the United States and of the State of Illinois and a resident and tax-payer of the city and school district of the city of Alton, would respectfully represent and show to your honors, that by virtue of the provisions of an act entitled 'An act of the General Assembly of the State of Illinois entitled 'An act to amend the twelfth section of the charter of the city of Alton, establishing and regulating the public schools in said city,' approved February 13, 1865,' it was amongst other things provided:  'The city of Alton is hereby enacted into a school district.  * * * The common council shall have and possess all the rights, power and authority necessary for the proper management of the school lands and funds belonging to said school district, and shall have power to prescribe the branches to be taught in the different schools; to grade and regulate the same; to erect, hire or purchase buildings suitable for school houses, and to keep the same in repair; to buy or lease sites for school houses, with the necessary grounds; to furnish schools with the necessary fixtures, furniture and apparatus, and to fix the amount of compensation to be allowed to teachers and for all these purposes, and to support and maintain schools and supply the inadequacy of the school funds, and to enact such ordinances as may be necessary to carry these powers and duties into effect.'  Which said act still remains in full force, and under and by virtue of its provisions the said common council of the city of Alton have heretofore and do now, by means of a board of education and

other agencies created by ordinances of said city, prescribe the branches to be taught in said different public schools, and grade and regulate the same, and do erect school houses and keep the same in repair, and by the agencies aforesaid govern, manage and control the public schools of said city and district in all respects whatever. And your petitioner would further represent to your honors, that soon after the passage of the act before mentioned the said city council of the city of Alton in due form adopted certain ordinances by which the said common council divided the city into five school districts, suited to the wishes and conveniences of the majority of the people of the said city and school district and to the children who have a right of admission and instruction in the said schools, without the exclusion of any child on account of his or her color, one of which was called the Irving school district, another the Lincoln school district, a third the Garfield school district, a fourth the Washington school district, and the fifth the Humboldt school district,—and in all these school districts there had been before that time, or there were afterwards, erected or secured by said common council school houses that were convenient to the children and to the inhabitants of said district, into which schools all children of suitable age and advancement were admitted for instruction without regard to color; that afterwards, to-wit, on the 20th day of September, 1897, and before that time, the said common council of the city of Alton had erected or caused to be erected, at the points hereinafter named, two additional school houses, one called the Douglas school and the other called the Lovejoy school, which houses were erected at the following points in said city: One on the corner of Market and East Tenth streets and the other on the corner of Union and Silver streets, and are remote from and inconvenient to many of the colored children of the city of Alton; that there are in the city of Alton and in the school district before mentioned at least one thousand

persons commonly called 'colored persons;' that they reside in all parts of said city, and at least two hundred of such persons are between the ages of six and twenty-one years, and are entitled to admission to the most convenient of the common public schools of the said city and school district, without exclusion, directly or indirectly, on account of the color of such child or children on any pretense whatever. And your petitioner would further represent to your honors, that on the eighth day of September, 1896, the said city council passed an ordinance which was approved by the mayor on the ninth day of September, 1896, entitled 'An ordinance repealing section 8 of an ordinance entitled an ordinance for the re-organization and continuance of the public schools of the city of Alton,' and in order to discriminate against all the children of color within the said city and school district, and to exclude such children, on account of their color alone, from the most convenient common public schools established in said city, it was ordained by the city council of the city of Alton that 'section 8 of an ordinance for the re-organization and continuance of the public schools of the city of Alton,' said last mentioned ordinance being a part of the revised ordinances of 1875, and being found on page 171 of the revised ordinances of the year, 'be and the same is hereby repealed, and the city of Alton, as a school district, from the passage and approval of this ordinance, be considered and is hereby declared to be one entire and complete school district, and that all school districts be and the same are hereby abrogated and abolished: *Provided, however,* that the repeal of this section (eight) shall in nowise affect or in anywise impair the legality and validity of the present board of education, or any of its members: *And provided further,* that hereafter, the members of the school board shall and may be selected without any reference to their residence in former school districts: *And provided also,* that hereafter the board of education, or the superintendent

of schools, if the said board shall see fit to delegate to said superintendent the right and authority of so doing, shall have the power to indicate and determine what school or schools the pupils of the public schools shall attend, without reference to the residence of such pupils: *Provided, further*, that such rules and regulations regarding the place of attendance shall be as near as possible uniform and general in their application.' And your petitioner would further represent to your honors, that the purpose for which such ordinance was passed by the common council of the city of Alton was to give to the board of education of said city and district the right, power and authority to discriminate against the colored children in said city between the ages of six and twenty-one years who were qualified and had the right to enter the public schools of said city and exclude said children from the most convenient of such schools; that on, to-wit, the 14th day of September, 1897, in order to carry into effect the purpose of the common council of said city and to discriminate against the colored children aforesaid on account of their color, and exclude them from the most convenient public schools, the said board of education of the city of Alton, and the aforesaid school district, passed and adopted the following preamble and resolutions:

"WHEREAS, the crowded condition of our schools renders it necessary to transfer pupils from the different school houses to other places or school houses; be it

"*Resolved*, That the superintendent of our schools be and is hereby instructed to send school children to such school houses as the committee on teachers may direct him.

Which said resolution was, under the authority of the common council of the city of Alton, adopted by the board of education of said city as a mere deceitful, fraudulent evasion of the duty of the said common council not to exclude any child in said city or district from the public schools between the ages of six and twenty-one years, on account of his or her color; that there are now, and

were, seven public school houses in the said city and district owned by and under the control of the common council; that said public school houses are ample for the admission, instruction, grading and classification of all the children in said city and district, and that all of the said children in said city and district between the ages of six and twenty-one years are entitled and of right ought to be admitted into and instructed in such of said public school houses as is reasonably most convenient to them, without any discrimination, or the exclusion of any such child or children between the ages of six and twenty-one years, directly or indirectly, on account of the color of such child; that the said board of education of the said city and school district of the said city of Alton have established eight grades for the pupils of said public schools of said city, acting through the board of education, as aforesaid, have employed white teachers in each of the five original schools, commonly called the 'white schools,' established in said city, to each of whom is assigned instruction in not to exceed two grades below the said high school grade, and have employed two colored teachers for each of said school houses known as the Douglas and Lovejoy schools, requiring each of the teachers in the two last mentioned schools to teach four grades, and in that way give superior advantage to the white children taught in the other five schools of said city and district; that the manifest purpose of the city council of the city of Alton and of the board of education of the said city, acting under the influence and authority of the common council of said city, was and is to exclude the said colored children of said city and school district between the ages of six and twenty-one years from the most convenient of the public schools of said city, and to compel them to attend the said Douglas and Lovejoy schools without regard to their residence or to their convenience and solely on account of their color; that there are school houses within the said city and school district which are

convenient to the residence of the children of color and from which they are excluded on account of their color; that your relator, Scott Bibb, who is himself a person of color, has two children who are also persons of color, who live with him, and for whose care, nurture and education he is responsible,—that is to say, Minnie Bibb, who is of the age of seven years, and Ambrose Bibb, of the age of eight years,—and who have heretofore attended and were admitted into the school called the Washington school, and were graded and instructed in that school, which is the one most convenient to said children as well as to your relator. And your petitioner alleges that the children of your relator have now to travel at least one mile and a half in order to reach either the Douglas or Lovejoy school, and in order to do so must pass the Washington school, to which they have been heretofore admitted and have now the legal right of admission, and there are also many other colored children who are subject to the same or similar inconveniences. And your petitioner charges that in all of the acts of the common council of the city and school district of the city of Alton, which consists of Henry Brueggeman, mayor, and George Burton, Edmund Beall, H. J. Bowman, George Davis, Walter Day, Lawrence Fahrig, H. A. Hoffman, Henry Klunk, George Marsh, H. C. Matthews, Dennis Noonan, Ferdinand Volbracht, Alexander Wegener and Samuel H. Wyss, their intention was to exclude the colored children of said city and school district who are between the ages of six and twenty-one years, and who are qualified and entitled to enter into and be admitted to the public schools of said city to which white children alone are admitted and taught, on account of their color, without regard to their age, advancement or convenience, and compel the colored children to attend the Douglas and Lovejoy schools, which are taught by colored teachers and into which colored children alone are admitted. And your petitioner would further show to your honors that said

children, Minnie Bibb and Ambrose Bibb, who are children of color, have regularly presented themselves at the Washington school in said city and district, which they have heretofore attended, and requested the teachers who hold their appointment under the authority of the city council of the city, to be admitted, classed and instructed according to the rules of said school, but the mayor of said city and common council thereof have sent the police force of said city to the said Washington school with instructions to exclude the said Minnie and Ambrose Bibb from the said school solely on account of their color, and did so exclude them for no other reason whatever."

The prayer was that the court issue its writ of *mandamus* against the respondents, the mayor and members of the common council, (naming them,) commanding them without delay to allow the said Minnie Bibb and Ambrose Bibb to be admitted into and enter the Washington school, or the most convenient of the public schools of said city and school district to which they have the right of admission, without excluding either of them on account of their color or descent.

The respondents appeared and filed their answer, in which they admitted the passage of the ordinance mentioned in the petition under the said statute of 1865 but denied the alleged discrimination on account of color; alleged the passage of an ordinance delegating the power, authority and control over the schools to a board of education; denied that there were two hundred colored children of school age in said city, but stated upon information and belief that they did not exceed in number one hundred and forty-five; admitted the adoption by the board of education of the rule alleged, but alleged that it was adopted in good faith, to allow the transfer of pupils from one school to another in order to relieve the overcrowded condition of the schools of the city. Other allegations of the petition were denied by the answer.

To the answer the petitioner filed two pleas, the first of which averred that the respondents do exclude the said Minnie Bibb and Ambrose Bibb from the Washington school, or the most convenient public school of the said city and district, solely on account of their color. The second was not greatly different, but averred that the several acts of the respondents alleged in the petition were done with and for the intent and purpose of excluding, and do exclude, said Minnie Bibb and Ambrose Bibb from said Washington school, and the most convenient of the public schools of said city and district to which they were by age, advancement and residence entitled to admission, solely on account of their color. Issues of fact were made on these pleas and sent by this court to the circuit court of Madison county for trial. The jury, upon the trial in that court, found the issues for the respondents, and also answered in their favor divers special interrogatories submitted by the court at the request of the petitioner. The verdict and proceedings have been certified to this court.

LOUIS J. PALMER, PALMER, SHUTT, HAMILL & LESTER, and JOHN J. BRENHOLT, for the relator.

JOHN F. McGINNIS, and HENRY S. BAKER, for the respondents.

Mr. JUSTICE CARTER delivered the opinion of the court:

In this an original proceeding in this court for a writ of *mandamus* we certified to the circuit court of Madison county for trial certain issues of fact. The proceedings in that court, including the verdict of the jury, have been certified to this court. The verdict was in favor of the respondents, and if no error was committed by the court below and the verdict is sustained by the evidence the writ should be denied. It is insisted, however, by counsel for the petitioner, and it clearly appears to us from the record before us, that the court below erred in excluding evidence offered by the petitioner on the trial, and that

the verdict should be set aside and the issues submitted to another jury. The evidence, so far as the jury were permitted to hear it, tended to prove the discrimination alleged in the petition. The evidence shows that the relator's children had previously attended the Washington school, which was located within four blocks of their residence and was the most convenient of access to them. The Lovejoy school was upwards of a mile away, and access to it was otherwise inconvenient to them. The Washington school had four teachers and eight grades; the Lovejoy school two teachers and eight grades, and in each was a fourth grade,—a grade to which the relator's children were entitled to admission upon their certificates which had been issued to them. This grade in neither school was full, and it seems there was room in either for these children. It was not claimed by the respondents on the trial that there was any reason for their exclusion from the school or schools in their neighborhood and which were most convenient for them to attend, except that the assignments of children to the different schools were made to prevent the overcrowding of some of the schools and insufficient attendance at others, but it was neither urged nor proved that the Washington school was or would have been, with these children as pupils, overcrowded, or the number of scholars at the Lovejoy school of this grade insufficient or disproportionate, or, if so, that there was any reason, other than that of race distinctions, for assigning them to the Lovejoy school. True, the burden was on the petitioner to prove the affirmative of the issues, and the respondents were not called upon, in the first instance, to prove any reason for the exclusion of the children in question from the Washington school. Notwithstanding their assignment to the Lovejoy school they presented themselves, upon the opening of the schools, at the Washington school, and, with other colored children who did likewise, were by the teacher placed separate and apart from the white

children and no lessons were assigned to them nor were they permitted to recite.    A few days later the chief of police of the city, acting, as he testified, partly under the order of the mayor and partly under the order of the board of education, stationed policemen at the doors of the Washington school to prevent, and who did prevent, relator's children and others from entering that school. One of these policemen testified that he was ordered by his superior to keep the colored children out of the schools; others testified that they went there under orders to prevent disturbances of the peace.

On this state of the proof the petitioner, by proper questions put to witnesses on the stand and by proper offers of proof, sought to prove that all colored children were excluded, in the manner and by the methods stated, from the Washington school and its privileges and required to attend the Lovejoy or Douglas school, where only colored teachers were employed and colored children attended, while white children were not so excluded. The court refused to admit the evidence but confined the proof to the exclusion of the two children of the relator. Substantially the same question, in different forms, was presented for the ruling of the court, whether any colored children were allowed to attend "white schools," so-called, or any white children attended the "colored schools," and the question was decided against the petitioner and the evidence excluded

There was manifest error in these rulings of the court. It is obvious that it would be exceedingly difficult for the petitioner to prove that the two children of the relator were denied admission to the school which they had previously attended, and that they were assigned to another of the same grade in a different part of the city remote from their residence, solely on account of race distinctions, without proof of the fact, if it was a fact, that the same action was taken with reference to other children of the same race.    There were many children of African

descent of school age in Alton, estimated by the respondents themselves at one hundred and forty-five, and we can not suppose that the respondents would select two such children and deny to them equal school privileges with white children solely on account of their color, and allow all other colored children in the city to attend the schools with white children.   It would, of course, be assumed by the jury that the respondents acted from some intelligent motive, and in the absence of any proof that the same rule of exclusion and assignment was applied to other children of the same race, it would be difficult, if not practically impossible, to prove, and for the jury to find, even if true, that racial distinctions had anything to do with the action complained of.   If the People had been permitted to prove, in accordance with the offer made on the trial, that there were a large number of children of school age of African descent in the city and school district, living in different parts of it, and that they were by the act of the respondents excluded from the schools most convenient for them and which were attended by white children, and were assigned, without regard to residence or convenience, to the Lovejoy and Douglas schools, where no white children attended, and that the relator's said children were included in the same general action of the respondents, and that there was no other reasonable ground specially applicable to the relator's children for their exclusion, the case would have presented a very different aspect to the jury; and, as before said, without proof upon the larger question which was within the allegations of the petition, proof of the illegal discrimination alleged as to the relator's children was practically impossible.   The effect of the ruling of the court was to prevent the proper determination by the jury of the principal question of fact sent down by this court for ascertainment.

The witness Finke, the president of the board of education, testified that he did not know the Bibb children,

and did not know whether they went to the Washington school or not.  He was then asked whether there were any colored children going to that school, and the court refused to allow him to answer.  He was then asked whether there were any colored children in attendance at any of the schools in the city attended by white children, and the respondents' objection to this question was also sustained.  But it is unnecessary to specify particular questions among so many put to different witnesses, as the same rulings were made as to all, and by these erroneous rulings the issue was practically decided against the petitioner before it was submitted to the jury.

We are also of the opinion that this witness should have been permitted to answer what instructions he gave to the superintendent of schools with reference to the admission of colored children to the several schools, and under what authority such instructions, if any, were given.  The only record of the board of education in evidence was this resolution:

"WHEREAS, the crowded condition of our schools renders it necessary to transfer pupils from the different school houses to other places or school houses; be it

"*Resolved*, That the superintendent of our schools be and is hereby instructed to send school children to such school houses as the committee on teachers may direct him."

It is not, of course, denied that the transfer of pupils for reasons specified in this resolution, or for other legal reasons, was within the power and discretion of the board.  A wide latitude for the exercise of discretion in such matters is necessarily left to the school authorities, but they have no discretion whatever to admit, or refuse to admit, children to certain schools for reasons based upon color or differences in race of the pupils.  Nor is it claimed by the respondents that any such power or discretion exists, but they insisted on the trial, and their position was in part sustained by the trial court, that the petitioner must produce record evidence of the acts

complained of to maintain the issues against the respondents. In other cases where acts of illegal discrimination against school children of African descent have been before this court for review such discrimination was shown by the records of the school authorities. Thus, in *People ex rel.* v. *Board of Education,* 127 Ill. 613, and *People ex rel.* v. *Board of Education,* 101 id. 308, rules and resolutions passed by the board showed the illegal discrimination. But neither the People nor those injured by the illegal discrimination are remediless merely because officers acting as a body make no record of their illegal acts. If that were the law, then all that would be necessary to make one illegal act enforcible and effectual would be to perform another or omit to perform some other legal duty. The petitioner does not insist that either the ordinance or the rule of the board is, or that both together are, upon their face invalid, as providing in terms for the discrimination complained of, or that any record was made of the alleged illegal discrimination, but that the mayor and members of the council, intending and contriving to exclude children of African descent from equal privileges with white children, passed the ordinance in question to enable them to do so, and then, by and through the board of education, or its members and the police force, carried their purposes into execution without making any official record of their alleged illegal action. If this contention were true, the alleged illegal discrimination would not, of course, appear from any record, and the petitioner would have the right to prove such illegal acts by any competent evidence.

This phase of the case becomes important for consideration in view of the exclusion by the trial court of testimony offered by the petitioner as to what was said by the respondent Brueggeman, who was at the time the mayor of the city of Alton, respecting his acts and purposes in excluding children of African descent from the white schools. By questions proposed to several wit-

nesses on the stand, counsel for the petitioner sought to
elicit this evidence, but the objections of counsel for the
respondents were sustained by the court and the wit-
nesses were not permitted to answer. In producing their
proof on this subject, counsel for the petitioner offered
to prove by Harry Coats, a witness on the stand, "that
on the 22d day of September, 1897, he, with other parties,
had an interview with the mayor of the city of Alton,
Henry Brueggeman, one of the respondents in this pro-
ceeding, sent to him as one of a committee of colored
people, to ascertain from him (said Henry Brueggeman)
why the children Ambrose and Minnie Bibb, children of
Scott Bibb, the relator, were kept out of the Washing-
ton school, and that the mayor of Alton, Henry Brueg-
geman, said to the witness, Harry Coats, that 'we built
the Douglas and Lovejoy schools exclusively for colored
children, and I have the power and authority of the city
council to place my police at the school, over the school
houses of the city of Alton, except the Douglas and Love-
joy schools, and I propose to keep the niggers out of
school with white children; that I don't care where they
live, but I will keep them out of the schools with the
white children in the city of Alton if I have to use every
policeman I have got in the city to do it.'" Like offers
of proof were made in connection with the testimony of
other witnesses, but the court refused to allow the proof
to be made. In so deciding we are of the opinion the court
was in error. Brueggeman, the mayor, was one of the
respondents charged with this illegal action and against
whom the petition prays the writ may be awarded. The
suit was not brought against the corporation as such,
but against certain officials to compel them to perform a
public duty. The mayor was the executive head of the
city government, charged with the duty of faithfully exe-
cuting its laws. He was the head of the police depart-
ment, and the chief of police testified that in sending
policemen to exclude from the schools all who had not

received tickets of admission to such schools he acted "partly" under orders given by the mayor; and besides, the jury could hardly be expected to believe that these officers were in daily attendance at the school houses for nearly two weeks, turning colored children away, without the knowledge and authority of the mayor and members of the common council. Inasmuch as the evidence was excluded, it must, for the purpose of this decision, be taken as true that while the police force of the city was so engaged and acting under the orders of the head of the city government, a committee of citizens, considering themselves aggrieved and deprived of their lawful rights by this action, waited upon the mayor to ascertain the reason for such action and why the relator's children were so excluded; and we are of the opinion that what he said in response to this inquiry was a part of the *res gestæ* and was admissible. It was explanatory of the action which he was then taking.

The same rule applies to the exclusion by the court below of the testimony of another witness, who was asked by counsel for the petitioner what a certain police officer, James Pack, said about his act while putting the two Bibb children out of the Washington school. The court having refused to allow witness to answer, the following offer of proof was made: "Relator offers to prove by the witness that said officer, James Pack, a policeman in the city of Alton, in September, at the beginning of the school year, pushed Minnie and Ambrose Bibb out of the Washington school, and told them and the witness he had been instructed by the mayor to prevent the colored children from attending the Washington school; that they must go to the school built for them exclusively,—the colored school called the Lovejoy school." As this officer was acting under the authority and orders of the mayor, what he said while engaged in the particular act of enforcing that authority and here complained of, and as explanatory thereof, was a part of the *res gestæ*, and admissible.

(*Fairfield Turnpike Co.* v. *Thorp*, 13 Conn. 178; *Mix* v. *Osby*, 62
Ill. 193; 9 Am. & Eng. Ency. of Law, 348.)   Indeed, if the
evidence fairly tended to prove that the respondents,
among themselves or between themselves and others,
whether such others were members of the board of edu-
cation or of the police department or were without offi-
cial position, agreed together to deprive the children of
African descent of the city and school district of Alton
of their lawful rights and privileges to attend the public
schools without exclusion or discrimination on account of
their color, then upon proof, *prima facie*, of such conspir-
acy, it would have been competent for the petitioner to
prove what any one or more of such persons said about
the matter while carrying out their unlawful purpose.

Section 14 of article 15 of the act to establish and
maintain a system of free schools provides that "any
school officer or officers, or any other person, who shall
exclude or aid in the exclusion from the public schools of
any child who is entitled to the benefits of such school,
on account of such child's color, shall be fined, upon con-
viction, in any sum not less than five ($5) dollars nor more
than one hundred ($100) each, for every such offense."
And section 4 of article 16 provides that "all boards of
school directors, boards of education or school officers
whose duty it now is or may be hereafter to provide in
their respective jurisdictions, schools for the education
of all children between the ages of six and twenty-one
years, are prohibited from excluding, directly or indi-
rectly, any such child from such school on account of the
color of such child." By provisions of the special charter
of the city of Alton the common council was vested with
the power and authority, among other things, to support
and maintain schools; to grade and regulate the same;
to prescribe the branches to be taught; to erect, hire
or purchase buildings suitable for school houses; to buy
or lease sites for school houses, with necessary grounds
therefor; to assess a tax for the same, and to enact such

ordinances as may be necessary to carry these powers into effect. It is not shown or claimed that these powers, or any of them, have been taken from the council. They carry with them corresponding duties, and we are of the opinion that the mayor and council cannot shield themselves behind the board of education, which they by ordinance have created, and that an unlawful exclusion of colored children from equal school privileges with others, by the board of education, suffered and permitted by the mayor and council, would be sufficient in this case to authorize the issuance of the writ as prayed. The court below should have permitted no evasion of the issues of fact certified to it for trial. In *Chase* v. *Stephenson*, 71 Ill. 383, this court said (p. 385): "The free schools of the State are public institutions, and in their management and control the law contemplates that they should be so managed that all children within the district, between the ages of six and twenty-one years, regardless of race or color, shall have equal and the same right to participate in the benefits to be derived therefrom. While the directors, very properly, have large and discretionary powers in regard to the management and control of schools in order to increase their usefulness, they have no power to make class distinctions, neither can they discriminate between scholars on account of their color, race or social position."

It may be that the wisest of both races believe that the best interests of each would be promoted by voluntary separation in the public schools, and while such voluntary action not in violation of law could not be interfered with by the courts, yet the law is too plain for argument, and has been often decided, that no child otherwise entitled to attend any public school in this State can, on account of the color of such child, be excluded, directly or indirectly, from such school by any school officer or public authorities. It is not doubted, of course, that it was the duty of the mayor and police to preserve

the peace and prevent disturbances thereof, from any source, in the vicinity of the schools as well as elsewhere in the city, nor that it was the duty of those who conceived that their legal rights were denied to them to avoid unseemly conduct and seek protection in the courts; but it is no less the duty of the courts to enforce the law as it stands, without respect to race or persons.

The verdict of the jury certified to us is set aside, and the circuit court of Madison county is directed to submit the issues to another jury and to proceed in the cause in accordance with the views we have expressed and as before directed.

*Verdict set aside and new trial ordered.*